# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DENNIS BROWN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 06-3092-WEB |
| ) | |
| DAVID MCKUNE, ) | |
| El Dorado Correction Facility, ) | |
| & ) | |
| PHILL KLINE, ) | |
| Kansas Attorney General, ) | |
| ) | |
| Respondents. ) | |

## MEMORANDUM AND ORDER

Pursuant to 28 U.S.C. § 2254, petitioner Dennis Brown seeks relief from his Kansas state conviction. Petitioner argues his conviction is unconstitutional because there was insufficient evidence to support his conviction and he received ineffective assistance of counsel.

## I. Facts.

Between May 2, 2000 and June 12, 2000, a series of robberies occurred at four different stores in Junction City, Kansas. The suspect was described as a black male, with a moustache and ranging from 5' 6 to 6' 0 tall and weighing about 120 to 170 pounds. (Tr. at 61:2-25, 167: 17 - 168: 6, 316: 22-24). One witness labeled the suspect at 5'5" but added he was always in a crouched position. (Tr. at 317: 7-20). One witness put the suspect even shorter at a little taller than 5' 2. (Tr. at 190: 7-21). Petitioner is described as a black male with a moustache who is 5'5" and 140 pounds. (Tr. at 470: 2, 379: 17-18, 381: 18-20).

The suspect wore a ski mask described as either dark green, blue, dark, dark blue, royal blue, or black. (Tr. at 60: 5-6, 89: 19-20, 207: 18, 168: 9, 309: 25, 189: 12-13, 316: 18). The suspect was also observed wearing gloves. (Tr. at 237: 14-17, 318: 25 to 319: 1, 60: 6-9; 62: 12-19, 330: 13-16). The suspect was described as wearing the following clothing: light blue denim shirt, blue button up sweater long sleeve blue jacket, a long sleeve blue shirt, a light blue button up shirt, and a dark long sleeve shirt. (Tr. at 60:14-15, 90: 9-16, 309: 24-25, 307: 3, 208: 9-10, 315: 21-23). The suspect brandished a black hand gun on each occasion. (Tr. at 96: 5 - 96: 21, 162: 22 - 164: 4, 195:23-24, 313: 24-25, 56: 9-10).

During the May 11th, 2000 robbery of the Total gas station, the suspect stole money and two books of lottery tickets. (Tr. at 85:1-23, 94: 1 to 95: 3). During that robbery, the suspect held a gun to an employee's head and threatened to kill her. (Tr. at 87: 19-24). During the May 2, 2000 robbery of a liquor store, the suspect took four to five hundred dollars as well as two bottles of champagne. (Tr. at 54-55, 56: 11-21, 59: 18-20).

Lieutenant Rasmussen, in 2000, was the supervisor for the investigations division for the Junction City Police department. Lieutenant Rasmussen was on duty on the night of June 23, 2000, when he saw a black male suspect, matching the description of the suspect in the robberies, standing in front of the Pinata restaurant near a Kwik Shop. (Tr. at 373: 3 to 375: 25). The suspect was wearing a dark blue knit cap, a long-sleeved blue shirt, and khaki pants. (Id.). Rasmussen called in a description to local units and gave the location of the suspect. (Id.). Marked patrol units approached the suspect from the east and the suspect ran. (Tr. at 378: 23 to 379: 4). Fleeing west down an alley, the suspect crossed a street and continued in a northerly direction eventually going between some houses where officers in chase lost sight of him. (Tr. at 380: 21-25). During the

chase, Officer Rains observed the suspect drop several items including; a gun, black gloves, shoes, and a long-sleeved shirt. (Tr. at 394: 7 to 395: 14). After losing sight of the suspect, Officer Rains retraced his footsteps, located the dropped items. (Tr. at 395: 24 to 400: 6). Meanwhile, Officer Waters, who was back at the Pinata restaurant, located a grey 1988 Oldsmobile vehicle with a warm exhaust pipe in the alley. (Tr. at 430: 9 to 431: 6). The cars tags, NZK320, traced the vehicle back to Petitioner at 134 East 11th. (Tr. at 432: 8-15).

After receiving information about the Oldsmobile and its owner, Officer Popovich, who was involved in the initial chase of the suspect, proceeded to Petitioner's address. Along the way, Popovich observed a black male with braided hair and wearing no shirt and dark pants run across 7th Street and head into an alley. (Tr. at 413: 2 to 415: 23). Officer Kingsbury, also involved in the initial chase, was the first to arrive at 134 East 11th, whereupon he spoke with the only individual then at the residence, Natalie Bethel (Bethel), Petitioner's girlfriend. (Tr. at 461: 18-20). Shortly thereafter, Petitioner approached the residence breathing heavily and was instructed to lay on the ground where he was handcuffed. (Tr. at 450: 18-24, 447: 25 to 448: 6). After his arrival on the scene, Officer Popovich determined that Petitioner was the individual he witnessed running across 7th Street. (Tr. at 417, 3-20). When asked why he ran, Petitioner stated he ran because police had been beating people up and he was scared. (Tr. at 634: 5-10).

During the execution of a search warrant at Petitioner's residence, police found the following items: a bottle of champagne matching the description of a bottle stolen during the May 2nd robbery and a pair of Fila boots which were consistent with a print left during the May 11th robbery, when the suspect jumped onto, then over, the convenience store counter leaving a shoe print on the glass portion of the counter. (Tr. at 336: 16 to 337: 6, 339: 1-24, 496: 10-12, 507: 16-20). Police also

seized a pair of blue nylon Tommy jogging pants consistent with the description of the pants worn by the suspect in at least one of the robberies. (Tr. at 344: 2-9).

Police interviewed Bethel at Petitioner's residence and at police headquarters. Bethel reported that Petitioner had been acting strange lately. (Tr. at 548: 5). When Bethel would return home from her evening classes at approximately 10:45, Petitioner would make up excuses to go out for a couple of hours. (Tr. at 547: 16-20). She also reported finding hidden amounts of money and that she had received two bottles of champagne for her May 15th birthday. (Tr. at 548: 12-17, 554: 8-15). Bethel also identified numerous items that were either seized or recovered along Petitioner's path while eluding police. She identified a blue shirt and the shoes recovered during the chase; furthermore, she stated she had seen a blue shirt and B.B. gun in the trunk of Petitioner's Oldsmobile. (Tr. at 550: 14 to 551: 25, 553: 8-21, 611: 11-18, 619: 1-7, 627: 11 to 628: 17).

Subsequently, on June 3rd, 2000, the clerk working at the same Total gas station received one of the stolen lottery tickets from Mrs. Collins who was attempting to redeem the winning ticket. (Tr. at 202: 18 to 203: 9). Mrs. Collins alleged a black male offered her the ticket for $2. (Tr. at 205: 19-21). After the ticket was turned over to police, further investigation revealed that Mrs. Collins' husband gave her the ticket after he received the ticket from a Marcus Brown. (Tr. at 258: 22 to 259: 3). Petitioner was identified by Mr. Collins in both a photo lineup and an in-court identification as the individual who gave him the lottery tickets. (Tr. at 262: 25 to 263: 5, 295: 5-8).

The gun seized after chasing Petitioner was identified by witnesses as consistent with the one used during the robberies. (Tr. at 59: 13-17, 97: 10-19, 192: 25 to 193: 4, 209: 17-18). One person positively identified the gun. (Tr. at 315, 13-18). The jury was able to view the robbery videotapes and compare the robber's mannerisms to that of Petitioner. (Tr. at 77: 8 to 78: 13, 235: 11 to 236:

7, 329: 8-22). Even though the suspect wore a mask during the robberies, positive identifications were made at trial. (Tr. at 169: 8 to170: 9, 210: 14 to 211: 8).

Petitioner maintained his innocence at trial and blamed his brother as the perpetrator of the crimes. Petitioner's mother testified that he worked with her at daycare the days on which the robberies occurred; however, on cross-examination she could not account for the specific times he was at her house. (Tr. at 701: 8-14).

## II. Procedural History.

On December 4, 2000, Petitioner was convicted of five counts of aggravated robbery, one count of criminal threat, and one count of obstruction of official duty. Brown was sentenced to 167 months with 36 months post release supervision. Petitioner directly appealed, alleging the evidence was insufficient to support his conviction. On March 22, 2002, the Kansas Court of Appeals (KCA) denied the appeal in an unpublished opinion. *State v. Brown,* No. 87,189 (Kan. Ct. App. March 22, 2002). On June 12, 2002, the Kansas Supreme Court (KSC) issued an order denying review. On February 19, 2003, Petitioner filed a collateral appeal in state court, alleging *inter alia*, ineffective assistance of counsel. See Kan. Stat. Ann. 60-1507. On August 28, 2003, the district court denied this petition. On April 1, 2005 the KCA issued an unpublished opinion affirming the district court. *Brown v. State*, No. 91,947 (Kan. Ct. App. April 1, 2005). The KSC denied review on September 22, 2005. Brown filed this timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 28, 2006.

## III. Standard of Review.

The Court's standard of review is set out in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which "circumscribes a federal habeas court's review of a state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed.2d 144, 154 (2003). Where a state court has adjudicated a claim on the merits, the Court may not grant a writ of habeas corpus unless the adjudication:

> (1) resulted in a decision that was contrary to, or involves an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), "the only question that matters," is "whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." *Lockyer*, 155 L. Ed. 2d at 155. In other words, if § 2254(d)(1) applies, the Court need not conduct a de novo review of the state court decision. *Id.*

Clearly established Federal law means, "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* Determining what the Supreme Court has clearly established is usually "straightforward." *Id.*

First, a state court's decision is contrary to such law "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed.2d 914, 926 (2002).

Second, the state court's application of clearly established Federal law is unreasonable "if the state court correctly identifies the governing legal principle from our decisions but unreasonably

applies it to the facts of the particular case." *Id.*  "[A] decision is "objectively unreasonable" when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard v. Boone*, --F.3d --, 2006 WL 3030553 (10th Cir. 2006).  State court decisions are to be granted considerable deference; consequently, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.*  "Avoiding these pitfalls does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Patton v. Mullin*, 435 F.3d 788, 794 (10th Cir. 2005) (citing *Early v. Packer,* 537 U.S. 3, 8 (2002)).

Section 2254(e)(1) requires this Court to presume the state court's factual determinations are correct; furthermore, the prisoner bears the burden to rebut this presumption by clear and convincing evidence. § 2254(e)(1).  The Court does not stand to correct errors of state law and is bound by a state court's interpretation of its own law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

### IV.  Sufficiency of the evidence.

Petitioner argues there was insufficient evidence to support his convictions because it was impossible to identify the robber and there was no other evidence to link him to the crimes.

"Sufficiency of the evidence is a mixed question of law and fact." *Maynard*, --F.3d --, 2006 WL 3030553 at 6.  As a result, the Court must apply both section 2254 (d)(1) and (d)(2). *Id.* "When reviewing the sufficiency of the evidence on a habeas corpus petition, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Hamilton v. Mullin*,

436 F.3d 1181, 1194 (10th Cir. 2006) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).[1]  A reasonable jury can find a defendant guilty beyond a reasonable doubt in light of both "'the direct and circumstantial evidence, along with reasonable inferences therefrom.'" *United States v. Nguyen,* 413 F.3d 1170, 1175 (10th Cir. 2005) (quoting *United States v. Nelson,* 383 F.3d 1227, 1229 (10th Cir. 2004)).

Petitioner has not established by clear and convincing evidence that the jury erred.  While a ski mask no doubt made identification difficult, two witnesses positively identified Petitioner as the robber by his eyes.  Furthermore, there was substantial circumstantial evidence to support Petitioner's conviction.

The shoe found at Petitioner's residence matched the print left on the counter at one of the robberies.  A witness testified he had received a lottery ticket from Petitioner which had been stolen from one of the robbed stores.  The employee of the store where the lottery tickets were stolen testified the robber held a gun to her head and threatened to kill her.  A champagne bottle consistent with the one stolen from the liquor store was found at Petitioner's residence.  Bethel stated Petitioner gave her two bottles of champagne for her birthday, which coincided with the two bottles of champagne that were taken during the robbery.  Petitioner's physical description is consistent with that of the robber.  Petitioner's girlfriend stated she had found sums of money around the house.  Police had discovered an individual matching the description of the robber but he fled when approached by police.  Shortly thereafter, Petitioner arrived at his house out of breath and sweaty and police identified him as the individual they had been chasing.  Bethel recognized the clothing and gun discarded by the fleeing suspect as belonging to Petitioner.  Witnesses identified the gun

---

[1] The KCA used a similar standard.

discarded by Petitioner as consistent with the one used during the robberies.

At, trial, Petitioner provided evidence that he was not involved in the robberies; however, the jury is free to weigh the conflicting evidence and credibility. *Maynard*, --F.3d--, 2006 WL 3030553. Petitioner has failed to meet his burden to show by clear and convincing evidence that the facts supporting the jury's conclusion are incorrect. After looking at all of the facts at trial, the Court finds the jury's determination to have resulted in a decision that was reasonable in light of the facts presented. Furthermore, the Court finds a reasonable trier of fact could have found Petitioner guilty of the robberies, when the evidence is viewed in the light most favorable to the prosecution. The KCA's decision was not an unreasonable application of Supreme Court precedent and habeas relief cannot be granted for this claim.

## V.  Ineffective Assistance of Counsel.

Petitioner next argues his counsel was unconstitutionally ineffective because he failed to raise the issue of marital privilege to prevent the use of out of court statements and in court testimony from his alleged common law wife.

To establish a claim of ineffective assistance of counsel, Petitioner must show his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced his case. *Strickland v. Washington,* 466 U.S. 668, 687-688 (1984).[2] To establish prejudice, Petitioner must show there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Id.* at 694. Failure to raise a meritless

---

[2] The KCA denied Petitioner's claim using state law; however, this is at least as favorable as the familiar standard in *Strickland*. *Brown v. State*, No. 91, 947 at 7 (citing *State v. Betts,* 272 Kan. 369, 387, 388, 33 P.3d 575 (2001)).

argument is not ineffective assistance of counsel. *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995).

The state district court held an evidentiary hearing to determine this issue. Petitioner, his mother, and Bethel gave testimony supporting the existence of a common law marriage at the time of the trial. The state introduced evidence that before and throughout the trial, Brown referred to Bethel as either his fiancee or his girlfriend. Petitioner's counsel also stated he considered raising the marital privilege but decided against it because there was not evidence to support a common law marriage.

The state district court found counsel's performance to have been reasonable. The opinion held the marital privilege did not apply because the evidence did not show the existence of a common law marriage. See *In re Estate of Antonopoulos,* 268 Kan. 178, 192, 993 P.2d 637 (1999) (listing the elements of a common law marriage); see Kan. Stat. Ann. 60-423(b) (marital privilege). The KCA upheld this decision, finding the evidence did not support Brown's argument that he was common law married during his trial. *Brown*, No. 91,947 at 10.

The Court will not review the KCA's decision that Petitioner was not common law married as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68; see *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (state courts are the ultimate expositors of state law).

Because there was no common law marriage at trial, it would have been futile to argue for the applicability of the marital privilege. As a result, Petitioner's counsel was not ineffective for failing to raise this issue. Petitioner has failed to show he is entitled to habeas relief. § 2254(d).

Petitioner's motion for relief under 28 U.S.C. § 2254 (Doc. 1) and Certificate of Appealability under 28 U.S.C. § 2253 are hereby DENIED. The Clerk is directed to enter judgement for Respondents.

SO ORDERED this 4th day of December, 2006.

                                           s/ Wesley E. Brown
                                           Wesley E. Brown, Senior U.S. District Judge